(93 South. 751)

No. 25294.

CITY OF NEW ORLEANS v. TEXAS TRANSPORT & TERMINAL CO., Inc.

(July 17, 1922. Rehearing Denied by Whole Court Oct. 19, 1922.)

(Syllabus by Editorial Staff.)

1. **Commerce** ⬤➡63—License tax on steamship agent held not to violate commerce clause.

A license tax imposed by a municipal ordinance on a company acting as steamship agent for certain steamship companies in soliciting cargo, arranging for its acceptance, and performing other duties, for a commission on the gross freight charges, is not a direct hindrance or regulation of interstate or foreign commerce, but affects such commerce only remotely, and does not violate Const. U. S. art. 1, § 8, cl. 2, reserving to Congress exclusive authority to regulate foreign and interstate commerce.

2. **Commerce** ⬤➡63—Local tax may affect foreign or interstate commerce remotely or incidentally.

A local tax may affect interstate or foreign commerce remotely and incidentally, without infringing on the exclusive federal authority to regulate such commerce.

Appeal from Civil District Court, Parish of Orleans; Percy Saint, Judge.

Suit by the City of New Orleans against the Texas Transport & Terminal Company, Inc. Judgment for plaintiff, and defendant appeals. Affirmed.

Terriberry, Rice & Young, of New Orleans, for appellant.

Ivy G. Kittredge, City Atty., and Michel Provosty, Asst. City Atty., both of New Orleans, for appellee.

O'NIELL, J. The question propounded is whether a license tax, imposed by municipal ordinance, upon the business of steamship agents, is, in its application to the business of the defendant in this case, violative of the second clause of the eighth section of the first article of the Constitution of the United States, reserving to the Congress exclusive authority to regulate commerce with foreign nations and among the several states. The defendant company has appealed from a judgment declaring the tax valid.

The ordinance in question, No. 6608 of the commission council of New Orleans, is the general revenue law of the city. It levies a graded license tax upon every business, trade or occupation that is subject to taxation. The tax levied upon the business of steamship agents is graded according to the annual gross receipts of the business, and is $400 per annum when the year's receipts amount to $100,000 or more. The receipts of defendant's business exceeded $100,000, and defendant is therefore liable for the tax of $400, unless the business is interstate or foreign commerce.

The record does not show whether defendant is a domestic or foreign corporation, but that is a matter of no importance. The main office, or what is called the home office, of the company, is in New York. The establishment in New Orleans, carrying on the business that is the subject of this litigation, is referred to in the testimony as a branch office. The company has a branch office or establishment also at Galveston and at Port Arthur, Tex., at San Francisco, Cal., at Savannah, Ga., and at Baltimore, Md. Whether the business done in each city is that of a separate corporation is left in doubt. However the only business that we are dealing with in this case is that which is done in New Orleans, by the local establishment.

The business is confined to dealings with shipowners, charterers and operators, whose vessels trade between New Orleans and foreign ports, and between New Orleans and ports outside of Louisiana, in the United States. None of the ships from which the defendant company derives its business or patronage trades between New Orleans and

another port in Louisiana, or between two ports in this state. In other words, all of defendant's patrons are shipowners, charterers or operators, engaged in either interstate or foreign commerce. Defendant represents four steamship lines regularly, under contract, for a commission fixed at a certain percentage of the gross amount of the freight charges collected by defendant for each steamship company. The four companies are the Compagnie Generale Transatlantique, carrying passengers and freight between New Orleans and Havre, Bordeaux, Antwerp, Hamburg and Bremen; the Holland-American Line, carrying passengers and freight between New Orleans and Rotterdam and Amsterdam; the Navigasions Generale Italiana, carrying freight between New Orleans and the Mediterranean ports; and the Toyo-Kison-Kaishn, carrying freight between New Orleans and the Japanese and Chinese ports. Defendant also, occasionally, handles the business of tankers carrying fuel oil from New Orleans or from Baton Rouge, and of tramp ships taking cargo of sugar from New Orleans, all engaged in interstate or foreign commerce. In such cases, defendant's remuneration for the services rendered is not a commission, but, quoting the testimony of defendant's local manager, "the vessels are handled on a lump-sum basis—so much for handling the steamer." Defendant's local manager admitted, too, in his testimony, that his company was always ready and willing to accept employment from any shipowner, charterer or operator, engaged in interstate commerce, at the port of New Orleans. All steamship traffic at this port is either interstate or foreign commerce.

Defendant does not own or charter or operate ships, or share in the profits or losses of any shipowner, charterer or operator. Nor does any shipowner, charterer or operator share in the profits or losses of defendant's business. The duties performed and services rendered by defendant—and by steamship agents generally—are: Soliciting and engaging cargo for the ships, and nominating the ships for lifting the cargo; arranging for acceptance of delivery of cargo on the wharves; arranging with stevedores for discharging and loading cargo; issuing, in the name of the shipowner or charterer, bills of lading covering the cargo; arranging for bunkering and fitting the ships; collecting the freight charges due the ships; paying the ship's disbursements; attending to the immigration service, such as furnishing crew lists and obtaining identification cards for the seamen, and assisting the ship captains in all matters of local customs and regulations, with which, as a rule, ship captains are not familiar; and, finally, remitting to the shipowners or charterers the freight charges collected, less the ship's disbursements and the commissions due the steamship agent. The steamship agent has authority from his principal to quote freight rates, in soliciting cargo. He has authority also to buy fuel oil or coal for bunkering a ship, and to contract for fitting a ship, when that is necessary, for any special or peculiar cargo. The steamship agent has authority also to issue receipts, in the name of his principal, for cargo delivered on the wharf. The steamship agent is therefore, in many respects, the local representative of any shipowner or charterer who has engaged his services.

With regard to the employment of stevedores for discharging or loading cargo, the record in this case shows that the service is rendered by another corporation, styled J. P. Florio & Company, Inc., which is a subsidiary of the defendant company.

The business of steamship agents is an extensive business in New Orleans, as it is in every large seaport. As a separate or an independent business, it is a result of the development of the country's commerce with

foreign nations and among the several states. In the early days, when time was not so much the object or subject of economy as it is to-day, every ship's captain, for his own ship, discharged the duties and rendered the services for which local steamship agents are employed nowadays. But it would be impracticable now for a ship's captain to remain with his ship in port long enough to attend to the many matters which the local steamship agents can and do attend to for a ship at sea or in a foreign port. The business of steamship agents is therefore a necessary adjunct to commerce on the high seas.

We have stated the facts fully, perhaps more in detail than is necessary, in order to show every feature or characteristic of defendant's business, that might aid in determining whether it is subject to local taxation or is under Federal regulation. The Supreme Court of the United States admits that no formula has yet been devised, that is applicable to any or every case of this character, for determining whether a local tax is violative of the commerce clause of the Constitution. Osborne v. Mayor of Mobile, 16 Wall. (83 U. S.) 482, 21 L. Ed. 472; Hump Hairpin Mfg. Co. v. Emmerson, 258 U. S. 290, 42 Sup. Ct. 305, 66 L. Ed. 622. The decisions of the august tribunal, however, boiled down and reduced to rules, have made it easy to recognize the important or distinguishing feature of any case.

[1, 2] The important and distinguishing feature of this case is that the business of the defendant company, however necessary as an adjunct to the interstate and foreign commerce of the steamship lines, is not a part of it. A tax on the business of the steamship agent does not increase the expense or reduce the profit of any steamship company's business. The tax is therefore not a direct hindrance or regulation of the interstate or foreign commerce of the steam-ship lines. If the steamship agent were employed at a salary, by a steamship company engaged in interstate or foreign commerce, a license tax imposed upon the local business of the steamship agent would be a tax upon the business of his principal. If, under any other arrangement between the steamship agent and his patrons, the tax imposed upon the local business done by the steamship agent would be reflected in the expense account, and ultimately in the profit and loss account, of the interstate or foreign commerce of his patrons, the tax would be a direct hindrance to their interstate or foreign commerce. But the fact that the local business of the steamship agents in this port and the interstate and foreign commerce of the steamship lines are dependent upon each other does not make a tax upon the local business of the steamship agents a tax upon the interstate or foreign commerce of the steamship lines. The reason is that, if the tax upon the local business of the steamship agents affects the interstate or foreign commerce of the steamship lines at all, it does so only remotely. A local tax may effect interstate or foreign commerce remotely or incidentally without infringing the exclusive federal authority to regulate such commerce. The local license tax levied upon the business of ship chandlers, dealing only with steamships engaged in interstate or foreign commerce—and all of the ships that come to this port are engaged in either interstate or foreign commerce—is a remote and incidental burden upon their interstate and foreign commerce, in so far as it increases the price of ship chandlery. But the local tax upon the ship chandler's business is not, for that reason, such an interference with the interstate and foreign commerce of the steamship lines as is forbidden by the commerce clause in the Constitution.

In Leloup v. Port of Mobile, 127 U. S. 640,

8 Sup. Ct. 1380, 32 L. Ed. 311, Mr. Justice Bradley, for the court, said:

"We may here repeat, what we have so often said before, that this exemption of interstate and foreign commerce from state regulation does not prevent the state from * * * regulating matters of local concern which may incidentally affect commerce, such as wharfage, pilotage, and the like."

In Hopkins v. United States, 171 U. S. 578, 19 Sup. Ct. 40, 43 L. Ed. 290, it was said:

"The business of buying and selling live stock at stock yards in a city by members of a stock exchange as commission merchants is not interstate commerce, although most of the purchases and sales are of live stock sent from other states, and the members of the stock exchange are employed to sell by letter from the owners of the stock in other states, and send agents to other states to solicit business, and advance money to the cattle owners, and pay their drafts, and aid them in making the cattle fit for market."

In Coe v. Town of Errol, 116 U. S. 517, 6 Sup. Ct. 475, 29 L. Ed. 715, it was said:

"Products of a state, although intended for exportation to another state and partially prepared for that purpose by being deposited at a place or port of shipment within the state, are liable to be taxed like other property within the state.

"Exportation is not begun until goods are committed to the common carrier for transportation out of the state to the state of their destination or until they have started on their ultimate passage to that state. Until that time they are taxable as a part of the general mass of property in the state, although they are not taxable as exports.

"The carrying of property in carts or vehicles or floating it to the depot, where the journey is to commence, is no part of the exportation."

In New York ex rel. Pennsylvania Railroad Co. v. Knight, 192 U. S. 21, 24 Sup. Ct. 202, 48 L. Ed. 325, it was said:

"A franchise tax imposed under appropriate statutes of the state of New York upon the Pennsylvania Railroad Company for carrying on a cab service wholly within the state, for the purpose of conveying its passengers to and from its ferry landing in New York City, the charges for which are entirely separate from those for other transportation, is not an unconstitutional burden on interstate commerce, but is a tax upon an independent local service, preliminary or subsequent to any interstate transportation."

In the course of his opinion, in the case last quoted, Mr. Justice Brewer, for the court, after quoting from Coe v. Town of Errol, gave this apt illustration:

"As shown in the opinion from which we have just quoted, many things have more or less close relation to interstate commerce which are not properly to be regarded as a part of it. If the cab which carries the passengers from the hotel to the ferry landing is engaged in interstate transportation, why is not the porter who carries the traveler's trunk from his room to the carriage also so engaged? If the cab service is interstate transportation, are the drivers of the cabs and the dealers who supply hay and grain for the horses also engaged in interstate commerce? And where will the limit be placed?"

The city attorney, in this case, cites, as appropriate, the decision in Ficklen v. Shelby County Taxing Dist., 145 U. S. 1, 12 Sup. Ct. 810, 36 L. Ed. 601. If the basis of that decision was that the license tax was not reflected in the expense accounts of the nonresident merchants who actually sold the goods and shipped them from other states into Tennessee, the decision is appropriate to this case. The local license tax which was declared valid in that case, levied upon brokers, buyers or sellers, on commission or otherwise, was a flat fee of $50 per annum, plus 10 cents on every $100 of capital invested in the business; provided that, if no capital was invested, the additional tax was 2¼ per cent. on the gross annual commissions, charges or compensations of the business. The licensee was required to give bond to report the amount of his commissions, charges and compensations at the end of the year, and to pay the 2¼ per cent. then. In January, 1887, each of the licensees, C. L. Ficklen, and Cooper & Co., having no capita

invested, paid the fee of $50, took out the license, and gave bond to report the amount of their commissions, charges and compensations, and to pay the 2¼ per cent. thereon, at the end of the year. At the beginning of the year 1888, each licensee tendered $50 and demanded a license for that year, but declined to report the commissions, charges or compensations for the year 1887, or to pay the 2¼ per cent. thereon. The county trustee refused to issue the license unless Ficklen and Cooper & Co. would each report the amount of commissions, charges and compensations for the year 1887 and pay the 2¼ per cent. thereon. Ficklen and Cooper & Co. proceeded by injunction to prevent the collection of the 2¼ per cent. and were successful in the Supreme Court of the United States. The business of each licensee was said to be that of a merchandise broker. Each rented a room, in Shelby county, where he kept and exhibited his samples and solicited business and negotiated sales for merchants residing in other states. The brokers did not sell goods, but took orders and sent them to the nonresident merchants, who shipped the goods direct to the purchasers. The record does not show that either of the agents or brokers was paid a salary by a nonresident merchant; and we assume that the brokers' profits consisted of commissions paid by the nonresident merchants on the sales which the agents or brokers negotiated with local buyers. The opinion in the case, by Chief Justice Fuller, maintains that the license tax based upon the amount of profits thus earned by the local business of the brokers was not a tax on interest to commerce, notwithstanding the sales for which the commissions were paid were made in interstate commerce. The force of the ruling on that subject, however, was impaired to some extent by a suggestion in the opinion that the brokers' license to do business was not limited to transactions with nonresident mer-

chants, and by a further suggestion that the brokers were obligated by their bonds to report their profits and to pay the 2¼ per cent. thereon.

Appellant cites and relies upon the ruling in McCall v. People of the State of California, 136 U. S. 104, 10 Sup. Ct. 881, 34 L. Ed. 392. In that case, the local license tax that was declared invalid was "for every railroad agency, twenty-five dollars per quarter." McCall, who refused to pay the tax, was an agent, in San Francisco, for the New York, Lake Erie & Western Railroad Company, having its principal place of business in Chicago and operating a continuous line of railroad thence to New York. McCall's only duty was to solicit passenger traffic for the road he represented; that is, to induce persons contemplating a trip east to be booked over the New York, Lake Erie & Western Railroad. He did not sell tickets, or make any collections or disbursements for the road, but merely went with the passengers to the Central Pacific Railroad office, where the tickets were sold to them. The case as reported does not show how the agent was paid for his services; but the theory of the decision is that he was paid a salary by the railroad company. Whether he was paid a salary or a commission is not so important, inasmuch as the decision of the case turned upon the conclusion of fact that the tax would have been an expense of the railroad company itself if the agent had paid it. The decision therefore cannot be regarded as maintaining that a license tax imposed upon an independent local business is violative of the commerce clause of the Constitution if the tax only remotely or incidentally affects interstate commerce.

The attorneys for appellant have directed our attention to the fact that the decision in McCall v. People of the State of California has been cited with approval at least seventeen times; that is, in the following cases:

Norfolk & Western Railroad Co. v. Commonwealth of Pennsylvania, 136 U. S. 114, 10 Sup. Ct. 958, 34 L. Ed. 394; Crutcher v. Commonwealth of Kentucky, 141 U. S. 47, 11 Sup. Ct. 851, 35 L. Ed. 649; Pacific Express Co. v. Seibert, 142 U. S. 339, 12 Sup. Ct. 250, 35 L. Ed. 1035; Ficklen v. Shelby County Taxing District, 145 U. S. 1, 12 Sup. Ct. 810, 36 L. Ed. 601; Brennan v. City of Titusville, 153 U. S. 289, 14 Sup. Ct. 829, 38 L. Ed. 719; Hooper v. State of California, 155 U. S. 648, 15 Sup. Ct. 207, 39 L. Ed. 297; Hopkins v. United States, 171 U. S. 578, 19 Sup. Ct. 40, 43 L. Ed. 290; Williams v. Fears, Sheriff, 179 U. S. 270, 21 Sup. Ct. 128, 45 L. Ed. 186; Stockard v. Morgan, 185 U. S. 27, 22 Sup. Ct. 576, 46 L. Ed. 785; Atlantic & Pacific Telegraph Co. v. City of Philadelphia, 190 U. S. 160, 23 Sup. Ct. 817, 47 L. Ed. 995; Norfolk & Western Railway Co. v. Sims, 191 U. S. 441, 24 Sup. Ct. 151, 48 L. Ed. 254; Western Union Telegraph Co. v. State of Kansas ex rel. Coleman, 215 U. S. 1, 30 Sup. Ct. 190, 54 L. Ed. 355; International Text-Book Co. v. Pigg, 217 U. S. 91, 30 Sup. Ct. 481, 54 L. Ed. 678; United States Fidelity & Guarantee Co. v. Commonwealth of Kentucky, 231 U. S. 394, 34 Sup. Ct. 122, 38 L. Ed. 283; City of Sault Ste. Marie v. International Transit Co., 234 U. S. 333, 34 Sup. Ct. 826, 58 L. Ed. 1337, 52 L. R. A. (N. S.) 574; Kansas City, Fort Scott & Memphis Railway Co. v. Botkin, 240 U. S. 227, 36 Sup. Ct. 261, 60 L. Ed. 617; Cheney Brothers Co. v. Commonwealth of Massachusetts, 246 U. S. 147, 38 Sup. Ct. 295, 62 L. Ed. 632.

Our reading of the opinions in the cases cited has confirmed our interpretation of the ruling in McCall v. People of the State of California, and has convinced us that the decision is not against the established doctrine that a state or municipal tax on a local business may affect interstate or foreign commerce remotely or incidentally without infringing the commerce clause of the Constitution. In fact, the decision was only an affirmance of the doctrine of the drummers' cases, viz.: Robbins v. Taxing District of Shelby County, 120 U. S. 489, 7 Sup. Ct. 592, 30 L. Ed. 694; Asher v. State of Texas, 128 U. S. 129, 9 Sup. Ct. 1, 32 L. Ed. 368; and Stoutenburgh v. Hennick, 129 U. S. 141, 9 Sup. Ct. 256, 32 L. Ed. 637.

Norfolk & Western Railroad Co. v. Commonwealth of Pennsylvania is authority for the doctrine that a state cannot, under the guise of a license tax, interfere with the right of a foreign corporation, engaged in interstate commerce, to do business in the state. The license tax declared invalid in that case was imposed directly upon the interstate commerce, as appears from one of the headnotes of the opinion, viz.:

"A license tax assessed under the Pennsylvania act of June 7, 1879 (P. L. 112, 120), by the Auditor General of that state against such company [meaning an interstate railroad domiciled in Virginia] for keeping an office in Philadelphia for the use of its officers, stockholders, agents and employees is a tax upon the company's business of interstate commerce, and is a violation of the commercial clause of the Constitution of the United States."

In Crutcher v. Commonwealth of Kentucky, the decision in McCall v. People of the State of California was cited in the same list—and as being in the same category—with the three drummers' cases, Robbins v. Taxing District, Asher v. Texas, and Stoutenburgh v. Hennick, and merely in support of the doctrine that a state law is unconstitutional that requires a foreign corporation engaged in interstate commerce to take out a license to do business in the state, "no matter how specious the pretext may be for imposing it." In Crutcher's Case, the state license tax was demanded of him for doing business in Kentucky, as the agent for the United States Express Company, an interstate carrier, domiciled in another state.

In Pacific Express Co. v. Seibert, the decision in McCall v. People of the State of California was cited in a list of cases maintaining the established doctrine that a state cannot lay a tax upon interstate commerce in any form, whether upon the transportation, or upon the receipts derived therefrom, or upon the occupation or business of carrying it on. The license tax in that case, however, was declared valid, because it was levied only upon the intrastate business of the corporation, viz.:

"A tax upon the business of an express company done within the state is not a tax upon interstate commerce, although the company is also engaged in business between the states."

In Ficklen v. Taxing District of Shelby County, it was said that, in McCall v. People of the State of California, McCall was the agent, soliciting passenger traffic, for "the interstate railroad which he represented." There is not the slightest intimation that McCall's agency was an independent, local business.

Brennan v. City of Titusville was another drummer's case. Brennan was a traveling salesman, going from house to house, in Titusville, Pa., exhibiting samples and taking orders for portraits and picture frames, for a manufacturer domiciled in Chicago, Ill., who filled the orders by shipping the portraits and frames direct from Chicago into Pennsylvania and other states. The city of Titusville demanded a license tax of Brennan for the business he was doing; and the Supreme Court of the United States declared the tax invalid, citing the three other drummer cases, viz., Robbins v. Taxing District, Asher v. Texas, and Stoutenburgh v. Hennick, and declaring that Ficklen v. Taxing District was not a departure, or was not intended as a departure, from the doctrine of the drummers' cases. From which we infer that Ficklen's business, unlike the drummers' occupation, was an independent brokerage business, separate and apart from the business of the merchants who sold the goods in interstate trade. McCall's Case was referred to as an illustration of a direct tax on interstate commerce; and, quoting from the opinion of Mr. Justice Lamar in that case, Mr. Justice Brewer, for the court, said: "The test is—was this business a part of the commerce of the road?" In other words, it was said that the court had found, as a fact, that McCall's agency was a part of the interstate commerce of the road. From which it may well be inferred that McCall was a salaried employee of the railroad company.

Hooper v. State of California is authority for the doctrine merely that the business of writing marine insurance is not "commerce," in the meaning of the commerce clause of the Constitution. The McCall Case was cited, with many other cases, as illustrating the doctrine that the right of a corporation engaged in interstate commerce to do business in any and every state is an exception to the general rule that the right of a foreign corporation to engage in business in a state other than that of its creation depends upon the will of such other state.

Hopkins v. United States is the stockyards case, to which we have already referred. In that case, the reference to McCall v. California indicates that McCall was a salaried employee of the interstate railroad company. The court distinguished McCall's Case from the stockyards case, thus:

"McCall v. California, 136 U. S. 104 [34:391, 3 Inters. Com. Rep. 181] is cited for the proposition that the solicitors employed by those defendants are engaged in interstate commerce. In that case, the railroad company was itself engaged in such commerce, and its agent in California was taxed by reason of his business in soliciting for his company that which was interstate commerce. The fact that he did not sell tickets or receive or pay out money on account of it was not regarded as material. His principal was a common carrier, engaged in interstate commerce, and he was engaged in that commerce because he was

soliciting for the transportation of passengers by that company through the different states in which the railroad ran from the State of California. [N. B. It was a mistake to say, 'from the state of California,' because the railroad ran from New York to Chicago]. In the case before us the defendants are not employed in interstate commerce, but are simply engaged in the performance of duties or services relating to stock upon its arrival at Kansas City. We do not think it can be properly said that the agents of the defendants whom they send out to solicit the various owners of stock to consign the cattle to one of the defendants for sale are thereby themselves engaged in interstate commerce. They are simply soliciting the various stock owners to consign the stock owned by them to particular defendants at Kansas City, and until the arrival of the stock at that point and the delivery by the transportation company no duties of an interstate commerce-nature arise to be performed by the defendants. As the business they do is not interstate commerce, the business of their agents in soliciting others to give them such business is not itself interstate commerce."

As we have already pointed out, the business of the members of the live stock exchange, in its relation to the interstate business of the live stock owners, was very similar to the business of steamship agents, in its relation to the interstate and foreign transportation of the steamship companies. We do not observe any distinction between the two cases, in the relation of the business that is here taxed, to the interstate and foreign commerce that it facilitates.

Williams v. Fears, Sheriff, is authority for the doctrine merely that the business of an emigrant agent, engaged in hiring laborers to work outside of the state, is not interstate commerce. Referring to the case of McCall v. People of the State of California, Chief Justice Fuller said:

"But there the business was directly connected with interstate commerce, and consisted wholly in carrying it on. The agent was the agent of the transportation company, and he was acting solely in its interest."

Stockard v. Morgan was another "merchandise broker" case, very similar to the drummers' cases. The broker, having a sample room in Chattanooga, Tenn., solicited and accepted orders locally for goods to be shipped into Tennessee by nonresident merchants whom the broker represented, and from whom the broker received a commission on the sales he negotiated. The court distinguished the case of Robbins v. Taxing District from that of Ficklen v. Taxing District, and held that the case then under consideration was within the doctrine of the Robbins Case, and that the broker's business was not subject to state or local taxation. The McCall Case was cited, in a long list containing, and as being in the same category with, the drummers' cases, Asher v. Texas and Stoutenburgh v. Hennick. The ruling in the Ficklen Case was cited and vindicated by the statement that Ficklen had taken out an unrestricted license to do either intrastate or interstate business, and that it had only so happened that his business was all interstate business in the year for which his business was taxed.

Atlantic & Pacific Telegraph Co. v. City of Philadelphia is authority for the doctrine that a telegraph company, although engaged in interstate commerce, is subject to a reasonable municipal tax for the enforcement of the local government's supervision over the company's poles and wires. The tax in that case was justified as a reasonable police regulation. The McCall Case was cited, in a long list of cases including the drummer cases, Robbins v. Taxing District, Asher v. Texas, and Stoutenburgh v. Hennick, as authority for the general proposition that federal authority to regulate interstate or foreign commerce is necessarily exclusive whenever the subject of such regulation is national in its character or admits of only one uniform system or plan of regulation. Surely, the business of steamship agents, as described in this record, is not of such national character as to require a uniform sys-

tem of taxation throughout the country. In that respect, it is as much a matter of local concern as is "wharfage, pilotage, and the like"; as to which the court said in Leloup v. Port of Mobile, 127 U. S. 640, 8 Sup. Ct. 1380, 32 L. Ed. 311:

"This exemption of interstate and foreign commerce from state regulation does not prevent the state from * * * regulating matters of local concern which may incidentally effect commerce, such as wharfage, pilotage, and the like."

In Norfolk & Western Railway Co. v. Sims, Sheriff, the sheriff of Parson county, N. C., undertook to collect a license tax of $350 from Sears, Roebuck & Co., domiciled in Chicago, for shipping a sewing machine, C. O. D. from Chicago, to Mrs. Satterfield, in Parson county, N. C. She had sent an ordinary mail order for the machine. The state court held that Sears, Roebuck & Co. should pay the tax; but the Supreme Court of the United States reversed the judgment. The only reference to McCall v. California was the statement that, in that case, "a license tax imposed upon the agent of a railroad between Chicago and New York, soliciting business in San Francisco, was held to be void."

In Western Union Telegraph Co. v. Kansas ex rel. Coleman, the ruling was that the state of Kansas could not exact of the telegraph company, which was a foreign corporation engaged in interstate commerce, a "charter fee" of a stated percentage of its entire authorized capital stock, as a condition of the company's right to continue doing business in the state of Kansas. The only reference made to the McCall Case was a recital of the facts and the ruling in the case; which we have repeated, in substance, several times. There was no intimation that McCall's business had been a separate business, distinct from the business of the railroad company that he had represented.

International Text-book Co. v. Pigg is authority for the proposition that the business of conducting a correspondence school, sending courses of instruction, with text-books, illustrations, etc., through the mail, from one state into other states, is interstate commerce, within the meaning of the commerce clause of the Constitution. In the course of the opinion rendered in the case, the court quoted at great length from Crutcher v. Kentucky, and then cited McCall v. People of the state of California, in a long list of cases, including the drummers' cases, as being "to the same effect" as was the ruling in Crutcher's Case.

In United States Fidelity & Guaranty Co. v. Kentucky, the business of publishing and furnishing to subscribers in several states a list of guaranteed attorneys at law was held not to be interstate commerce, notwithstanding some of the inquiries received and answered by the guaranteed attorneys, from subscribing merchants, were in contemplation of interstate commercial transactions. Referring to the doctrine of the McCall Case, the court said that it "was clearly within the reasoning and authority of Robbins v. Shelby Taxing District, * * * and other cases of that class."

In City of Sault Ste. Marie v. International Transit Co., the ruling was that the city could not require the transit company, a Canadian corporation, engaged in operating a ferry across the St. Mary's river, between the city of Sault Ste. Marie, in Michigan, and the province of Ontario, in Canada, to pay a license tax as a condition of the company's right to receive and land passengers and freight at the company's wharf in Sault Ste. Marie. The McCall Case was cited, in a long list of cases including the drummer cases, as maintaining "the fundamental principle involved."

In Kansas City, Ft. Scott & Memphis Railway Co. v. Botkin, the ruling was that an annual tax graduated according to the paid-up capital stock of the corporation, imposed

upon every domestic corporation for the privilege of being a corporation, was not a tax on the property of the railway company outside of the state, because the tax was not a property tax. The McCall Case, with many other cases, was cited merely for the broad statement that interstate commerce is not subject to local taxation "in any form."

In Cheney Brothers Co. v. Commonwealth of Massachusetts, the company was a Connecticut corporation, manufacturing and selling silk fabrics. The company maintained a selling office in Boston, where the company's salesmen solicited orders and sent them to the Connecticut factory, whence the goods were shipped direct to the buyers in Massachusetts. An important statement of the facts of the case was: "The salesman and the * * * rent are paid directly from Connecticut," etc. The business conducted by the salesman in Boston, therefore, was not an independent or a local business. The court cited the McCall Case, with other cases like it, in support of the court's ruling that the excise tax imposed by the state of Massachusetts upon the Connecticut corporation was not valid.

Our purpose in reviewing the seventeen cases in which the McCall Case was cited was to see how the Supreme Court of the United States had harmonized the decision in that case with the decision in the case of Ficklen v. Taxing District. The apparent conflict in the rulings has arisen from the fact that the report of the decision does not, in either case, show how the local agent or representative, of the nonresident engaged in interstate commerce, was paid for the services he rendered, or what was the immediate source of revenue from his business. Our conclusion is that McCall was regarded as a hired agent or representative of the corporation engaged in interstate commerce, and not as the proprietor of an independent or a separate, local business; and that Ficklen was regarded, not as a hired agent or representative of the nonresident merchants for whom he solicited business, but as the proprietor of an independent or separate, local business. Neither of the decisions has ever been overruled. Both have been cited often with approval. Therefore, they must be reconcilable by a difference in the court's conclusion on the controlling question of fact in each case. That question was, in each case, whether the local business that was taxed was an independent business or was a part of the interstate commerce of the patron or patrons of the local business.

Having examined all of the decisions that have been cited as pertinent, we have concluded that defendant's business, being local, and not a part of the interstate or foreign commerce of defendant's patrons, is subject to the license tax complained of. That is because the tax imposed upon the local business of the steamship agent is not an immediate burden upon the interstate or foreign commerce of the steamship lines, but affects it only incidentally and remotely, if at all.

The judgment is affirmed, at appellant's cost.

Rehearing refused by the WHOLE COURT.